**GLOBE NEWSPAPER COMPANY, et al., Plaintiffs, Appellees,**

v.

**Daniel F. POKASKI, etc., et al., Defendants, Appellants.**

No. 88–1413.

United States Court of Appeals, First Circuit.

Heard Oct. 4, 1988.

Decided Feb. 22, 1989.

Judith Fabricant, Asst. Atty. Gen., with whom James M. Shannon, Atty. Gen., Boston, Mass., was on brief, for defendants, appellants.

Holly A. Clarke on brief for Committee for Public Counsel Services, amicus curiae.

Jonathan M. Albano with whom E. Susan Garsh, Joanne D'Alcomo and Bingham, Dana & Gould, Boston, Mass., were on brief, for plaintiffs, appellees.

Before COFFIN and TORRUELLA, Circuit Judge, and TIMBERS,* Senior Circuit Judge.

COFFIN, Circuit Judge.

Appellees, the Boston Globe and two of its reporters, were denied access to certain court records of completed criminal cases on the basis of Section 100C of the Massachusetts General Laws, chapter 276. That statute authorizes the sealing of court records of criminal cases in which a conviction has not been obtained. The Globe brought suit in federal district court, asserting that it has a constitutional right of access to the requested records, and that the Commonwealth's statutory scheme impermissibly burdens that right. The district court held that the Commonwealth may not rely on § 100C to withhold records, 684 F.Supp. 1132. We now affirm in part and reverse in part.

### The Two Denials of Access

On two occasions in 1987, Boston Globe reporters were denied access to the court records of various completed criminal cases. The first incident occurred when a Globe reporter requested the records of a criminal case involving a Boston police officer. The Globe sought the records "to investigate a report that the trial court judge initially had found the police officer guilty [of possession of cocaine], but had reversed his finding after being informed that a guilty verdict would cause the officer to lose his job."

The materials sought by the Globe—the case "records"—included a transcript and/or audiotape recording of the trial, the case file and docket sheet, and all other records relating to the trial. A case file, as best we can tell,[1] consists of any pleadings and documents filed in connection with the case.

It is undisputed that the Globe was denied access to this material.[2] The clerk's office informed the Globe that the records were under seal pursuant to Mass.Gen. Laws Ann. ch. 276, § 100C and could not be released.[3] The Globe subsequently was informed by letter that sealed records could be obtained with court approval. The Globe has not initiated any proceeding, other than this litigation, to obtain access to the material.

The second incident stems from an investigation by the Globe's "spotlight team" into criminal cases initiated in Suffolk County in 1986 involving sexual offenses committed against juveniles. This time the Globe appears not to have requested transcripts and audiotapes of the proceedings, but only case files and detailed docket sheets.[4] The clerk's office provided the Globe with the 1986 docket books, which contain the detailed docket sheets of all

---

\* Of the Second Circuit, sitting by designation.

1. Upon appellees' request, the district court entered judgment on the pleadings after the submission of only a few unhelpful documents. We have felt somewhat handicapped by the lack of a more extensive factual record.

2. The court involved in this first incident was the West Roxbury Division of the District Court, Suffolk County. On the second occasion, the court involved was the Superior Court of Suffolk County.

3. There is some disagreement over whether access to the audiotape was denied on the basis of § 100C or Rule 114(A)(3) of the District/Municipal Courts Supplemental Rules of Civil Procedure, which deals exclusively with tape recordings. In the fact section of its brief, the Commonwealth states that access to audiotapes is governed by Rule 114(A)(3). There is no suggestion, however, that § 100C also does not cover audiotapes, and, indeed, the Commonwealth's argument focuses solely on section 100C. We therefore will proceed as though § 100C was the basis for the denial of the tape recording.

4. A "detailed" docket sheet "typically contains the docket number, the defendant's name, the charges brought against the defendant, the dates of hearings and other events in the case and sometimes a brief entry describing the event which occurred or action taken, the disposition of the charges and the sentence, if applicable." (App. at 11).

closed criminal cases initiated in that year. Upon reviewing the books, the Globe discovered that substituted for numerous detailed docket sheets were sheets marked "sealed" containing no information other than a docket number. The Globe's subsequent request for the files and detailed docket sheets of these sealed cases was denied, even with information redacted to eliminate the defendant's name. Once again, the denial was based on § 100C. The Globe was then advised that it should seek access to the redacted records in the equity session of the Superior Court. It declined to do so, and instead brought this action challenging the constitutionality of § 100C.

### The Statute

The relevant portion of § 100C is divided into two paragraphs.[5] The first paragraph directs court officers to seal the "records" of criminal cases in which a conviction has not been obtained for one of the following reasons: the defendant was found not guilty, the grand jury failed to indict, or the court made a finding of no probable cause. We note that this first paragraph provides for no court involvement; the sealing occurs automatically upon the completion of a criminal case ending in one of the above enumerated dispositions—regardless of the circumstances surrounding a particular case. The Committee for Public Counsel Services ("Amicus"), arguing in support of the statute, states that while cases are pending the records covered by both paragraphs are publicly available.

Although on its face the paragraph says nothing about the possibility of unsealing the records at some future time, the Commonwealth contends that access is not denied permanently but only delayed. It represents that the Globe may obtain access to sealed files by initiating a proceeding at which the defendant will bear the burden of justifying the records remaining under seal.[6] The Globe vigorously contests this reading of the statute, claiming that access is permanently foreclosed under paragraph one.

The second paragraph covers only those criminal cases in which there has been no prosecution or the court has entered a dismissal. In contrast to the first paragraph, however, the second paragraph authorizes the sealing of records at the close of the case only where the *court* finds that "substantial justice would best be served" by such action. Sealing, therefore, is apparently not automatic in cases ending with a nolle prosequi or a dismissal. "Substantial justice," however, is nowhere defined in the statute. The second paragraph, like the first, also says nothing about the possibility of obtaining access to sealed records at a later date.

### The District Court's Decision

The district court, although briefly noting the apparent differences between the two paragraphs, did not distinguish between them in holding § 100C unconstitutional as applied to the records sought here. Relying on Supreme Court case law giving the press and public a constitutional right of access to criminal proceedings, and

---

**5.** Mass.Gen.Laws Ann. ch. 276, § 100C provides in pertinent part:

In any criminal case wherein the defendant has been found not guilty by the court or jury, or a no bill has been returned by the grand jury, or a finding of no probable cause has been made by the court, the commissioner of probation shall seal said court appearance and disposition recorded in his files and the clerk and the probation officers of the courts in which the proceedings occurred or were initiated shall likewise seal the records of the proceedings in their files. The provisions of this paragraph shall not apply if the defendant makes a written request to the commissioner not to seal the records of the proceedings.

In any criminal case wherein a nolle prosequi has been entered, or a dismissal has been entered by the court, except in cases in which an order of probation has been terminated, and it appears to the court that substantial justice would best be served, the court shall direct the clerk to seal the records of the proceedings in his files.

**6.** The Commonwealth contends that access to records sealed under § 100C may be obtained either through an administrative or judicial proceeding. The record is unclear as to when one, rather than the other, would be available.

several circuit court decisions, including one from this circuit [7], extending that right to judicial documents, the district court began by finding that the records sought by the Globe implicate First Amendment concerns. The court believed that the public's interest in access was in no way diminished by the fact that the records sought here were of *completed* cases. To the contrary, it found that "[t]he argument for public access to court documents is particularly strong where, as here, the subject of press attention is the performance of the judicial system itself."

The court went on to hold that, even assuming the records may be obtained in the future, the statute places an impermissible burden on the public's right of access in that it requires those seeking information to initiate proceedings, thus reversing the constitutionally grounded "presumption of openness." In its view, Supreme Court precedent requiring open judicial proceedings absent particularized findings that closure is necessary to further a compelling governmental interest also requires that the requested records remain open absent such findings. Apparently assuming that the second paragraph does not require such findings prior to sealing, the district court found both paragraphs constitutionally deficient inasmuch as they authorize, regardless of the circumstances, the "automatic" sealing of records without any demonstrated need for such action.

### The Issues

The following issues are raised on this appeal:

First—Although both the Commonwealth and the Globe argue their positions on the assumption that blanket restrictions on access to records of closed criminal cases implicate the First Amendment, Amicus, the Committee for Public Counsel Services (charged by statute with responsibility for providing legal representation to indigent criminal defendants), challenges that assumption.

Second—The Commonwealth contends that, as to the records of cases ending in acquittal or a finding of no probable cause, the initial sealing at the close of the case serves the compelling state interest of preserving for defendants their only realistic opportunity to demonstrate the need for sealing. The Commonwealth further contends that the consequent burden on the press to initiate access proceedings is minimal because the defendant has the burden of demonstrating any continuing need for privacy. The Globe, questioning whether records may later be unsealed, in any event asserts that such a burden of seeking unsealing is too great, that privacy interests are not significantly furthered, that, in short, the presumption of access is reversed.

Third—The Commonwealth contends that even if blanket restrictions on records of cases ending in an acquittal or a finding of no probable cause are invalid, such a restriction is permissible with respect to cases in which a "no bill" [8] has been returned because there is no First Amendment right of access to grand jury proceedings, which traditionally have been conducted in secret. The Globe, in response, contends that because grand jury proceedings often are preceded by a public event, such as a press conference, the release of "no bill" records will not *always* undermine grand jury secrecy, and therefore, a blanket restriction on all such records is unconstitutional.

Fourth—The Commonwealth argues that the statute's second paragraph, which covers only cases dismissed or not prosecuted, is constitutional given its requirement that sealing occur only if a court finds such action in the interests of "substantial justice." The state does not suggest, as it does with no bill cases, that the records of such cases do not enjoy First Amendment protection. Rather, it contends that its courts will interpret the "substantial justice" requirement in accordance with Su-

---

7. *In re Globe Newspaper Co.,* 729 F.2d 47, 52 (1st Cir.1984).

8. A "no bill" is the professional colloquialism used to describe the decision of a grand jury not to issue an indictment.

preme Court jurisprudence, and thus, absent particularized findings that sealing is necessary to effectuate a compelling governmental interest, records covered by the second paragraph will remain accessible. The Globe maintains that if the statute is so construed, it has no problem with the second paragraph.

## Analysis

I. *Application of First Amendment to restrictions on access to records of criminal cases not ending in conviction.*

We limit our discussion of this threshold issue to whether the First Amendment is implicated in blanket restrictions on access to records of criminal cases ending in acquittals, findings of no probable cause, nolle prosequi, or dismissals. We specifically reserve for later discussion the application of the First Amendment to records of grand jury proceedings.

This circuit, along with other circuits, has established a First Amendment right of access to records submitted in connection with criminal proceedings. *In re Globe Newspaper Co.*, 729 F.2d 47, 52 (1st Cir. 1984).[9] The basis for this right is that without access to documents the public often would not have a "full understanding" of the proceeding and therefore would not always be in a position to serve as an effective check on the system. *In re Globe*, 729 F.2d at 52 (quoting *Associated Press v. United States District Court*, 705 F.2d 1143, 1145 (9th Cir.1983)).

In our view, *In re Globe* does not settle the matter. It held only that there is a right to judicial records. Because here the case files and proceedings previously were open, the question before us is not whether there is a right to the information but whether the Commonwealth has, by providing access in the past, given the public sufficient opportunity to obtain that information.

To answer this subsequent question concerning the extent to which the public/press must have access to criminal proceedings, Amicus urges us to apply the twofold test established by *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980), and its progeny. *See, e.g., Press–Enterprise Co. v. Superior Court*, 478 U.S. 1, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986) (*Press–Enterprise II*). The first step is an inquiry into whether historical tradition indicates that the proceedings, or, in our case, the records of such proceedings, were "presumptively open." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 569, 100 S.Ct. 2814, 2823, 65 L.Ed.2d 973 (1980).[10] The second step is an inquiry into whether "public access plays a significant positive role in the functioning of the particular process in question." *Press Enterprise II*, 478 U.S. at 8, 106 S.Ct. at 2740.

Amicus asserts that the historical test is not met because access to the records we are concerned with here "has never been unfettered," *citing Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978), where the Court refused to allow the copying of an audiotape of a presidential conversation, which had not only been played and widely reported in open court but every word of

---

**9.** *See, e.g., Associated Press v. United States District Court*, 705 F.2d 1143, 1145 (9th Cir.1983) (documents filed in pretrial proceedings); *In re Washington Post Co.*, 807 F.2d 383, 390 (4th Cir.1986) (documents filed in connection with plea and sentencing hearings); *Matter of The New York Times Co.*, 828 F.2d 110, 114 (2nd Cir.1987) (documents filed in connection with pretrial suppression hearings), *cert. denied,* — U.S. —, 108 S.Ct. 1272, 99 L.Ed.2d 483 (1988); *United States v. Peters*, 754 F.2d 753, 763 (7th Cir.1985) (trial exhibits); *United States v. Smith*, 776 F.2d 1104, 1111 (3rd Cir.1985) (bill of particulars).

**10.** It is perhaps unrealistic to apply too literally the historical prong to questions regarding *how much* access the Constitution requires because most questions involving the right to greater access are likely to arise in the context of technological advances, such as television. *See, e.g., Westmoreland v. Columbia Broadcasting System, Inc.*, 752 F.2d 16 (2d Cir.1984) (whether trial may be televised). In our view the *Richmond Newspapers* analysis is more suitable to sorting out those processes that the government may conduct in total secrecy from those to which it must provide the public access.

which had been distributed to the press in the form of a transcript.

■ We begin by observing that the fact that access to records "has never been unfettered" or that courts traditionally have claimed a supervisory power to refuse disclosure in certain cases does not answer the question whether the records of closed criminal proceedings have been "presumptively open." In *Globe Newspaper Co. v. Superior Court,* 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982), a case involving a challenge to a statute authorizing the mandatory closure of trials during the testimony of sexually assaulted minors, the Court dismissed an argument by the state that trials involving sexual assaults against minors traditionally have been subject to closure and therefore could be closed to the public:

> In *Richmond Newspapers,* the Court discerned a First Amendment right of access to *criminal trials* based in part on the recognition that as a general matter criminal trials have long been presumptively open. Whether the First Amendment right of access to criminal trials can be restricted in the context of any particular criminal trial, such as a murder trial ... or a rape trial, depends not on the historical openness of that type of criminal trial but rather on the state interests assertedly supporting the restriction.

*Id.* at 605 n. 13, 102 S.Ct. at 2619 n. 13, (emphasis in original).

■ In *Nixon v. Warner Communications, Inc.,* 435 U.S. at 597–98, 98 S.Ct. at 1311–12 (footnotes omitted), the Court recognized that

> [i]t is clear that the courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents. In contrast to the English practice, ... American decisions generally do not con-

dition enforcement of this right on a proprietary interest in the document or upon a need for it as evidence in a lawsuit.

That it could be suggested that our historical tradition has not been one of presumptive openness seems inconsistent with the historical materials available to the framers of the Constitution. Not only did the Philadelphia library used by the delegates to the Convention contain some sixty-three pamphlets reproducing the proceedings of mainly political prosecutions in England but it also held the ten volume set of Emlyn's enlargement of Salmon's *State Trials,* recounting centuries of treason, heresy and sedition trials.[11] The use made of these materials both by the delegates to the Constitutional Convention and by the Congress in deliberations leading to the Bill of Rights indicates the value placed on access to records of secretive criminal proceedings.

The second test suggested by *Richmond Newspapers* inquires into whether access "plays a significant role" in the better functioning of criminal justice. Openness of trials was observed in that case to contribute "assurance that the proceedings were conducted fairly ..., discouraged perjury, the misconduct of participants, and decisions based on secret bias or partiality." 448 U.S. at 569, 100 S.Ct. at 2823. Another value served was that of "public acceptance of both the process and its results," "awareness that society's responses to criminal conduct are underway," the "prophylactic aspects of ... community catharsis." *Id.* at 571, 100 S.Ct. at 2824.[12]

These interests seem clearly implicated in this age of investigative reporting and of continuing public concern over the integrity of government and its officials. Amicus cannot see any salubrious effect on a criminal proceeding produced by subsequent access to the records of that proceeding. But the present prospect of future access is a

---

**11.** Irving Brant, *The Bill of Rights* 34–35 (1965).

**12.** That access is obtained after the completion of the case makes no difference. As the district court pointed out, access to completed proceedings is indispensable where what is at issue is the system itself. Access to the records of com-

pleted cases also is necessary to ensure that the government's official records accurately reflect what actually transpired. *Cf. CBS, Inc. v. United States District Court,* 765 F.2d 823, 826 (9th Cir.1985).

felt presence, just as the prospect of appellate review is for the lawyers and judge in the trial of a case. Amicus also dismissed any more general effect, beyond a particular case, by saying, "the potential for adding to public debate is not the test for determining a First Amendment right of access." Such a view vastly understates the contribution to governance of investigative reporting aimed at exposing bribery, ex parte dealings, and judicial or other misconduct in connection with the disposition of criminal cases.

Finally, Amicus asserts that, once access to judicial proceedings is permitted, it is irrelevant that "it may be difficult for any one person or any one newspaper to attend every judicial proceeding in the state." This concept of "now or never," "speak now or forever hold your peace" is a strict, harsh one, narrowly confining First Amendment interests in what might be a large problem of governance to a temporally immediate, discrete episode. It seems to us to contradict the insight, expressed in *Richmond Newspapers*, 448 U.S. at 572–73, 100 S.Ct. at 2825: "Instead of acquiring information about trials by firsthand observation or by word of mouth from those who attended, people now acquire it chiefly through the print and electronic media. In a sense, this validates the media claim of functioning as surrogates for the public." If the press is to fulfill its function of surrogate, it surely cannot be restricted to report on only those judicial proceedings that it has sufficient personnel to cover contemporaneously.

We deal now with the argument of Amicus that *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978), bears on the threshold issue before us. In that case the question was whether copies of twenty-two hours of certain notorious audiotapes, subpoenaed from the President, which had been played in open court and transcripts of which had been furnished to the media must be, by compulsion of the First Amendment, additionally furnished to the media for commercial use.

The Court determined that any common law right of access had been trumped by the Presidential Recordings Act, which had given to the Administrator of General Services the custody and power to devise procedures for screening, classifying, and releasing Presidential tapes. In a very brief section addressed to First Amendment implications, the Court reaffirmed its holding in *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975), that the press "could not be prevented from reporting what it had learned and what the public was entitled to know." 435 U.S. at 609, 98 S.Ct. at 1317. But it saw a difference between accurate reporting of what had transpired and obtaining copies of records of what had transpired. The only explanations were that (1) the information flow to the public had not been "truncated," *id.*, and (2) since the "public has never had *physical* access" to the tapes, the press had no superior right to obtain copies. *Id.* (emphasis in original).

The Court in *Warner Communications* was dealing with a most idiosyncratic situation involving a Presidential privacy interest, a statute specifically governing access in a limited number of unique cases, prior distribution of complete transcripts, and a motive to copy the tapes for sale. In light of *Richmond Newspapers*, decided two years later, we cannot read *Warner Communications* as laying down a general rule for all criminal cases that once the substance of testimony and evidence has been exposed to public view, there is no right of access to visual and aural means of preserving it. For such an extension arguably would mean that once an open trial is held, a permanent barrier can be erected against inspection of exhibits, audiotapes, videotapes, and any papers to which the public had no "physical access." Proceedings that were recorded *only* on tape—as many are—would be forever insulated from inspectors. Moreover, there would be no opportunity to check whether, in light of a tape, a paper record or transcript had been altered.[13]

13.  *Cf. In re Reporters Committee for Freedom of*      *the Press,* 773 F.2d 1325, 1331 (D.C.Cir.1985);

We therefore conclude that, after *Richmond Newspapers*, a blanket prohibition on the disclosure of records of closed criminal cases of the types at issue here implicates the First Amendment. This threshold decision does not leave the state helpless. The Commonwealth simply has the burden to demonstrate why more access is not better than less.

II. *Assessing the Commonwealth's interest in sealing records of cases ending in a finding of "not guilty" or "no probable cause."*

The first paragraph of § 100C directs court officers to seal the records of cases in which the defendant "has been found not guilty by the court or jury" or "a finding of no probable cause has been made by the court." The sealing occurs automatically at the close of the case regardless of the circumstances. Neither the defendant nor the state is required to demonstrate a need for the sealing; in fact, the defendant need not even make an affirmative request that the records be sealed.[14]

The parties vigorously dispute whether access is permanently foreclosed under this provision. The Commonwealth tells us that there exist administrative and judicial procedures for obtaining access to sealed records, and that these procedures may be used to obtain records sealed pursuant to § 100C. The Globe responds that these procedures are of help only where the governing statute provides for subsequent access, and in its view § 100C does not so provide. We need not resolve this statutory issue because we conclude that § 100C cannot withstand heightened scrutiny even if records may be obtained later. We therefore will proceed as though the sealing is not permanent.

■ We begin our analysis by noting that § 100C is not a time, place, or manner restriction, which need only be reasonable to survive First Amendment scrutiny. *See Globe Newspaper Co.*, 457 U.S. at 607 n. 17, 102 S.Ct. at 2620 n. 17. The harm the Commonwealth seeks to prevent flows directly from the content of the information sought by the Globe, and therefore, § 100C must satisfy more exacting scrutiny. We adopt as the appropriate standard the traditional compelling interest/least restrictive means test.[15] To survive this heightened scrutiny, § 100C must satisfy three requirements. First, the objectives of the statute must be sufficiently important; second, the means chosen by the state must effectively promote the statute's objectives; and third, the statute must not infringe upon the First Amendment any more than is necessary to promote those objectives.

A. *Objectives and effectiveness of § 100C*

■ The broad concern of § 100C is to protect the privacy interests of criminal defendants whose cases have ended without a conviction. Both the Commonwealth and Amicus stress that the dissemination of case records can cause not only extreme

*United States v. Criden,* 648 F.2d 814 (3rd Cir. 1981); *Matter of Continental Illinois Securities Litigation,* 732 F.2d 1302, 1309 n. 11 (7th Cir. 1984). *But see United States v. Beckham,* 789 F.2d 401, 409 (6th Cir.1986) (no constitutional right to copy tapes played in open court); *Belo Broadcasting Corp. v. Clark,* 654 F.2d 423, 427 (5th Cir. Unit A Aug. 1981) (no First Amendment right to copy tapes where transcripts provided and tapes played in open court); *Valley Broadcasting Co. v. United States District Court,* 798 F.2d 1289 (9th Cir.1986) (same).

**14.** The statute was amended in 1983. Prior to that time, the defendant apparently had to request that the records be placed under seal.

**15.** The Court applied this standard in *Globe Newspapers Co.,* 457 U.S. at 606–07, 102 S.Ct. at 2620, stating that where "the State attempts to deny the right of access in order to inhibit the disclosure of sensitive information, it must be shown that the denial is necessitated by a compelling governmental interest, and is narrowly tailored to serve that interest." Although the Court phrased the standard somewhat differently in two later access cases, *Press–Enterprise Co. v. Superior Court,* 464 U.S. 501, 510, 104 S.Ct. 819, 824, 78 L.Ed.2d 629 (1984) (*Press–Enterprise I*) and *Press–Enterprise Co. v. Superior Court,* 478 U.S. 1, 13–14, 106 S.Ct. 2735, 2743, 92 L.Ed.2d 1 (1986) (*Press–Enterprise II*), substituting "higher values" for "compelling interest," we do not believe it intended to make the state's burden any less rigorous. Because we believe § 100C would not satisfy even a significantly less stringent standard, we need not dwell on the proper standard to be applied in access cases.

embarrassment and humiliation, but also severe professional and economic hardship because "[a]n arrest record often proves to be a substantial barrier to employment." *Menard v. Saxbe*, 498 F.2d 1017, 1024 (D.C. Cir.1974).

Section 100C does not attempt to protect these interests, however, by permanently closing off access to the records of all cases ending without a conviction. Massachusetts implicitly concedes that *permanent* sealing is not justified, and should not occur, in every case that ends without a conviction. Indeed, if lack of a conviction alone were sufficient to warrant permanent sealing, then subsequent access proceedings would serve no purpose since, by definition, every defendant would meet his or her burden. Nonetheless, the Commonwealth provisionally seals the records of *every* case upon its completion.

The Commonwealth argues that this provisional, across-the-board sealing is necessary because defendants will not be present when the public seeks access to their records at some point after the close of proceedings, and therefore often will not have notice of the public's request—obviously not a problem in the context of live proceedings. As a result, defendants may be deprived of the opportunity to argue against the release of their records. By provisionally sealing records and requiring those seeking access to initiate an administrative or judicial action, the Commonwealth presumably is able to alert defendants to the public's request and give them the chance to be heard prior to the release of records.[16] If a defendant presents suffi-

ciently weighty interests, the records remain under seal.

Thus, the immediate objective of § 100C, and the one by which we measure its success, is to ensure that records *that may be withheld consistent with the First Amendment* are not released simply because a court (or administrative body) was unaware of the interests weighing against public disclosure. As such, § 100C is a procedural device that serves the same purpose as a trial court's order staying proceedings while it conducts a closure hearing. In both cases, the goal is not to see that closure ultimately occurs, but instead to ensure that all arguments for and against closure are considered.

We agree that preventing the public disclosure of records that defendants do not want released, and that the state is not required to release under the First Amendment, is a compelling interest given the harm that disclosure of such records can cause. In addition, we find that § 100C is an effective means of promoting that interest. In so concluding, we proceed on the assumption that there exist at least some instances in which defendants will be able to show that their privacy interests outweigh the public's right of access.[17]

### B. *Least Restrictive Means*

We now must determine whether the Commonwealth has chosen the least restrictive means of promoting its objective. As we noted earlier, § 100C's goal is the same as a court's in temporarily staying a proceeding in order to consider a

---

**16.** It is not clear from the record or briefs whether the Commonwealth, in fact, notifies defendants. It may be that the Commonwealth takes into account the defendants' interests without obtaining their input. We will proceed on the assumption that the Commonwealth does indeed make an effort to notify defendants. We do so because we believe that the Commonwealth's case is strongest if such notification takes place. *See infra* at note 18.

**17.** We suspect, however, that defendants rarely will be successful. The most likely basis for denying access to records or proceedings—the protection of a defendant's fair trial rights—usually will not be a concern once a case has ended, except perhaps in situations where there

are related proceedings. In addition, because both the proceedings and case files already have been publicly accessible, defendants must convince a court or administrative body that their privacy rights have not been lost irretrievably. Nevertheless, while prior publicity weighs strongly against sealing, we do not believe it presents an insurmountable obstacle. *Cf., e.g., United States v. McLeod*, 385 F.2d 734, 749–50 (5th Cir.1967) (Wisdom, J.) (although not faced with First Amendment challenge, court held it was proper to expunge records to place those arrested "as far as possible" back in same position); *United States v. Linn*, 513 F.2d 925 (10th Cir.) (discussing standards), *cert. denied*, 423 U.S. 836, 96 S.Ct. 63, 46 L.Ed.2d 55 (1975).

defendant's request for closure. But the burden on the First Amendment is far greater, too great, we believe, to survive First Amendment scrutiny.

When a trial court conducts a closure hearing, the proceeding normally is stayed. The public, therefore, is not denied contemporaneous access to news, since the news is not occurring. By contrast, the news here cannot be suspended temporarily because it concerns past events. Thus, by requiring the public to initiate an administrative or legal action to obtain the records of closed cases, § 100C delays access to news, and delay burdens the First Amendment.

The Commonwealth tells us that the delay in the past often has been minimal, at times as little as a day. The statute, however, does not require that all requests be processed within a certain time frame. Indeed, on its face, the statute does not even suggest the possibility that access may be obtained once records have been sealed.

Although even a one to two day delay impermissibly burdens the First Amendment, *see, e.g., Associated Press*, 705 F.2d at 1147 (48 hours), we need not rest there because we are convinced that if the statute is to meet its objective of giving defendants the opportunity to argue for sealing, the delay frequently will be much longer. Before defendants can participate in a hearing, they must be contacted and given time to prepare. This will take time, in most instances far longer than 48 hours. In this case, for example, the Globe sought access to the records of all cases initiated in 1986. The Commonwealth obviously could not, within a few days, notify and obtain input from all defendants whose records were under seal.[18]

By sealing records in the first instance and requiring those seeking access to initiate an administrative or judicial action, § 100C also places on the public the burden of overcoming inertia. Moreover, to the extent that the press must obtain counsel to argue for the release of records, the statute imposes an economic burden on the public.

Given these burdens, we must consider whether the Commonwealth can achieve its objective by less restrictive means. We believe it can do so simply by allowing defendants to move for the permanent sealing of their records at the conclusion of trials and probable cause hearings, just as defendants are allowed to move for the closure of proceedings. Under such a scheme records would either remain open or be sealed permanently upon the close of proceedings, but there would be no delay. Moreover, the burden of overcoming inertia would now fall on defendants, where it belongs.

We do not anticipate that this scheme would place a serious economic burden on the public or create significant congestion in the Commonwealth's already busy courts. We suspect that many defendants would not make the effort in the first place to detail reasons supporting a request for sealing. Even when they do, a full hearing would be necessary only rarely. In most cases, we expect that defendants who request the sealing of records will be unable to make out even a prima facie case for sealing. Only when a defendant makes that showing would it be necessary to conduct a hearing in which the press participates.[19] Thus, in all but a few cases, the

---

**18.** If the Commonwealth plans to consider the arguments for and against closure without the defendants' input, § 100C would fall even shorter of satisfying constitutional scrutiny. Records cannot be sealed on the basis of general reputation and privacy interests. The Commonwealth, therefore, will need to know the specific harms that defendants will suffer, and we do not see how the Commonwealth would be fully informed about these personal circumstances without direct input from defendants. *Cf. Globe Newspaper Co.*, 457 U.S. at 608, 102 S.Ct. at 2621 (striking down statute that required closure of proceedings during testimony of sexually as-

saulted minors without regard for "desires of the victim" or specific harms suffered); *Press–Enterprise I*, 464 U.S. at 512, 104 S.Ct. at 825 (before voir dire may be closed, prospective juror must make affirmative request to "ensure that there is in fact a valid basis for a belief that disclosure infringes a significant interest in privacy.")

**19.** How extensive a hearing would be required is for the Commonwealth to decide. The press, of course, must be permitted to participate. *Globe Newspaper Co.*, 457 U.S. at 609 n. 25, 102 S.Ct. at 2621 n. 25.

defendant's request would be denied summarily and the records would remain available at no expense to the public.[20]

The Commonwealth contends, however, that it does not believe the press necessarily would fare better in the absence of § 100C and, more importantly, that defendants' interests would not be as well protected. Rather than trying to paraphrase the Commonwealth's argument, we set it out in significant part:

> In busy criminal courtrooms ..., such hearings would surely become so routine that truly particularized balancing would be impossible. Except in the rare case that attracts public attention during its pendency, the press and public would have no notice of such hearings and no opportunity for input. With equally rare exceptions, acquitted defendants would have no means of substantiating their future need for confidentiality beyond the general reputation and privacy interests common to all. Hearings conducted in this manner would thus inevitably result in automatic application of each particular judge's policy either in favor of or against sealing. Such a procedure would undermine both the First Amendment interest in access and the countervailing privacy interests of acquitted defendants.

We acknowledge that there is potentially a problem with the public receiving notice because, while members of the press would be entitled to participate in those cases serious enough to warrant a full-scale hearing, there is no guarantee that they will be aware of every such hearing.[21] Because we do not know how the Commonwealth will attempt in the future to protect defendants' privacy interests, we think it premature, however, to fashion notice requirements. Moreover, for reasons of comity, we think it proper to leave such a task to the state. We are confident that the Commonwealth's courts or its legislature can

devise means of ensuring that the press is adequately informed. *See In re Washington Post Co.*, 807 F.2d 383, 390 (4th Cir. 1986) (closure motions must be "docketed reasonably in advance of their disposition so as to give the public and press an opportunity to intervene....") (quoting *In re Knight Publishing Co.*, 743 F.2d 231, 234 (4th Cir.1984)); *United States v. Criden*, 675 F.2d 550, 559 (3rd Cir.1982) ("sufficiently in advance").

As for the behavior of trial courts under this alternative scheme, we decline to assume that they will disregard the Constitution and simply seal records on the basis of their own predilections, without giving the appropriate weight to the First Amendment's strong presumption of openness.

The Commonwealth's final contention is that a hearing conducted at the close of proceedings would be of no help to defendants whose need for confidentiality arises at some time after the case has ended. The Commonwealth suggests that these defendants would have no chance to alert a court to their altered circumstances. Thus, even though a defendant's records at that point could be sealed consistently with the First Amendment, they would remain publicly available.

We do not see why this must be the case. If circumstances change, defendants may petition the court at that time for the sealing of their records. The press could be given notice through open docket sheets and a hearing would take place just as it would have had the records been under seal and the public had been the one to initiate the process. The only difference would be that the "presumption of openness" no longer would be reversed.

We recognize that between the time circumstances change and the time that the defendant is able to petition the court, the public might obtain the defendant's records. We agree that it would be unfor-

---

**20.** We, of course, are not requiring the Commonwealth to do anything. We simply hold that if the Commonwealth chooses to provide defendants with an opportunity to argue against the release of their records, it may not do so by the means it has chosen.

**21.** Of course, the public or press also could take part in the informal procedure in which a defendant attempts to make out a prima facie case for closure, but in most instances there would be no member of the public present at that time.

tunate if the public were to obtain records at any time after changed circumstances make sealing possible. In our view, however, this possibility does not save § 100C.

First, the possibility that the press will obtain records after a change in circumstances would become real in only a small number of cases, since, if sealing is not justified at the close of proceedings, it rarely would be warranted at some later time. Even then defendants would generally be the first to know of the new facts making sealing possible, and therefore will be able to petition the court before any request is made for the records.

At this point, it is possible to see precisely what is at stake here. On the one hand, if § 100C is held invalid, there is the *possibility* that in a *handful* of cases, records will be released, even though at the time of release the defendants could have demonstrated a compelling need for placing them under seal.[22] On the other hand, if § 100C is upheld, there is the *certainty* that the public routinely will be forced to expend time and resources obtaining information to which it has a right under the First Amendment.

In our view, the constitutionally grounded presumption of openness simply is too strong to permit these certain burdens to remain in order to avoid harms that will occur only rarely, if at all. Accordingly, we conclude that § 100C is unconstitutional as applied to the records of criminal cases ending in a finding of "not guilty" or "no probable cause."

III. *The records of "no bill" cases.*

The Commonwealth contends that there is no need for us to assess the interests for and against the disclosure of "no bill" records because there is no First Amendment right to such records. We agree. The public has a First Amendment right to judicial documents and records because without them a full understanding of

judicial proceedings would be impossible. *In re Globe,* 729 F.2d at 52. Accordingly, the First Amendment attaches only to those records connected with proceedings about which the public has a right to know. *See Matter of New York Times,* 828 F.2d 110, 114 (2nd Cir.1987), *cert. denied,* — U.S. ——, 108 S.Ct. 1272, 99 L.Ed.2d 483 (1988). The public has no right to attend grand jury proceedings, and therefore, has no right to grand jury records. In contrast to criminal trials, "grand jury proceedings have traditionally been closed to the public and the accused," *Press–Enterprise II,* 478 U.S. at 10, 106 S.Ct. at 2741, and the Supreme Court has stated repeatedly that "the proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings," *Douglas Oil Co. v. Petrol Stops Northwest,* 441 U.S. 211, 218, 99 S.Ct. 1667, 1672, 60 L.Ed.2d 156 (1979). *See also United States v. Procter & Gamble Co.,* 356 U.S. 677, 78 S.Ct. 983, 2 L.Ed.2d 1077 (1958); *United States v. Sells Engineering, Inc.,* 463 U.S. 418, 424, 103 S.Ct. 3133, 3138, 77 L.Ed.2d 743 (1983). Thus, neither of the two *Richmond Newspapers* considerations is satisfied here.

The Globe argues, however, that in those cases in which a grand jury proceeding is preceded by a public event, such as a press conference or a publicly filed complaint, the release of records will not undermine this essential secrecy. The Globe contends, therefore, that because the disclosure of "no bill" records will not *always* be inimical to the proper functioning of the grand jury system, across the board sealing is impermissible under the First Amendment. The Constitution requires instead that there be a case by case assessment, the public having a right to those records the release of which does not hinder the functioning of the grand jury process.

This argument is flawed. The First Amendment right of access attaches only to those governmental processes that as a

---

**22.** We recognize that less well-off defendants, perhaps unaware of their rights and often without the aid of counsel, are less likely to request sealing, thereby allowing their records to remain open even when they could be closed consistently with the First Amendment. This presents a problem—but one which ought to be capable of solution by, for example, an affirmative requirement that trial judges and criminal defense lawyers inform defendants of their right to request sealing at any point.

*general* matter benefit from openness. It would be illogical to set up a presumption in favor of access and require the state to justify closure in particular cases if access were not thought to be beneficial most of the time. Thus, the fact that in certain cases access to the records of "no bill" cases may not be detrimental to the functioning of the grand jury system, and perhaps may even be beneficial to it, the two not necessarily being correlative, is not sufficient reason to create a *presumption* in favor of openness. For us to do so, we would have to conclude that, as a general matter, the release of these records would be beneficial.

The Supreme Court, in determining whether to release a grand jury transcript pursuant to Federal Rule of Criminal Procedure 6(e), has noted that "the interests in grand jury secrecy, although reduced, are not eliminated merely because the grand jury has ended its activities," *Douglas Oil,* 441 U.S. at 222, 99 S.Ct. at 1674. We think it clear that it will be only in the rare case that the records will not disclose at least some information previously unavailable. A publicly filed complaint or extensive press conference undoubtedly will reveal certain facts, including probably the target of the investigation, but in the majority of cases, the records will contain additional information that need not be made public. Thus, because we cannot conclude that as a general matter the release of "no bill" records would be beneficial to the functioning of the system, we hold that there is no First Amendment right of access to such records.[23]

IV. *Assessing the Commonwealth's interest in sealing records of cases ending in a finding of nolle prosequi or dismissal.*

■ The second paragraph of § 100C covers only the records of cases ending in a dismissal or nolle prosequi. We held above that the First Amendment is implicated by blanket restrictions on access to such records. We need not now assess the Commonwealth's interests in provisionally sealing these records because we believe our analysis of cases ending with an acquittal or a finding of no probable cause applies with equal force to a mandatory restriction on access to the records of cases ending in a dismissal or nolle prosequi.[24]

The Commonwealth contends, however, that unlike the first paragraph of § 100C, the second paragraph does not authorize the mandatory sealing of records. The second paragraph provides for sealing where "it appears to the court that substantial justice would best be served" by such action. The Commonwealth says we should assume that its courts will interpret this directive in accordance with Supreme Court precedent and seal records only where it is necessary to achieve a compelling interest. The Commonwealth, however, has not provided us with a state court interpretation of this language.

If the records covered by the second paragraph have in fact been sealed in conformity with Supreme Court caselaw, it should not be difficult to demonstrate. The Court has stated that before access may be denied, trial courts must make "specific, on the record findings" showing that closure is necessary to achieve a compelling interest. *Press–Enterprise II,* 478 U.S. at 13–14, 106 S.Ct. at 2743. Thus, we hold simply that the Globe must be provided with records covered by the second paragraph unless the Commonwealth can demonstrate that such findings were made.

*Conclusion*

We conclude that a blanket restriction on access to the records of cases ending in an acquittal, a dismissal, a nolle prosequi, or a finding of no probable cause, is unconstitutional, even if access is not denied permanently. The Commonwealth therefore may not rely on § 100C to withhold records of cases ending with an acquittal or a finding

23. The Commonwealth, of course, could choose to release grand jury records in particular cases.

24. We recognize that in cases ending with an entry of nolle prosequi there may be no proceeding at which defendants can argue for sealing. If that is so, we see no reason why the Commonwealth cannot provide defendants whose cases fall into this category with some sort of procedure for asserting their interests in sealing.

of no probable cause, including the tape recording of the police officer's trial. The Commonwealth also may not rely on § 100C to withhold the records of cases ending in a dismissal and nolle prosequi unless it can demonstrate that such records were sealed only after a court made specific, on the record findings that sealing was necessary to effectuate a compelling governmental interest. Finally, we conclude that, regardless of any prior publicity that may have occasioned a grand jury proceeding, the public has no constitutional right to the records of cases ending with a "no-bill," and therefore, the first paragraph's automatic sealing requirement is constitutional as applied to such records.

We make one final observation. Many defendants may have foregone an opportunity to argue for sealing at the close of their case, relying instead on the automatic sealing provision of § 100C. We think it only fair, therefore, that the Commonwealth be given some time to notify defendants affected by our holding in any way it deems practicable. Accordingly, the Commonwealth has 60 days from the date this decision becomes final to comply with the Globe's request.

*The judgment is in part affirmed, and in part reversed.*

*Appellees may recover two thirds of their costs.*