**UNITED STATES of America,**

**v.**

**Vincent A. CIANCI, Jr., Frank Corrente, Artin H. Coloian, Richard E. Autiello, Edward E. Voccola, and Joseph A. Pannone.**

No. 00–83–T.

United States District Court, D. Rhode Island.

Dec. 12, 2001.

197

Richard W. Rose, Terrence P. Donnelly, Asst. U.S. Attorneys, United States Attorney's Office, Providence, RI, for U.S.

Richard M. Egbert, Boston, MA, Edward J. Romano, North Providence, RI, Martin G. Weinberg, Oteir, Weinberg & Lawson, Boston, MA, for Cianci.

C. Leonard O'Brien, Jr., Providence, RI, for Corrente.

Patricia K. Rocha, John A. Tarantino, Adler, Pollock & Sheehan, Providence, RI, for Coloian.

Richard C. Bicki, Cerilli, McGuirl & Bicki, Providence, RI, Edward L. Gerstein, Little Compton, RI, for Autiello.

William J. Murphy, Murphy & Fay, L.L.P., Emili B. Vaziri, W.G. Grande & E. Vaziri Law, Inc., Providence, RI, for Voccola.

Joseph A. Bevilacqua, Jr., John Cicillini, Bevilacqua & Cicilline, Providence, RI, for Pannone.

Howard Merten, Vetter & White, Providence, RI, for the Providence Journal.

### MEMORANDUM AND ORDER DENYING MOTION FOR ACCESS TO SEARCH WARRANT AFFIDAVIT

TORRES, Chief Judge.

The Providence Journal Company (the "*Journal*") has filed a renewed motion for access to an FBI agent's affidavit that was submitted in support of a request for a warrant to search Providence City Hall. Because any qualified right of access that the *Journal* may have is outweighed by the likelihood that dissemination of the affidavit's contents prior to trial will prejudice the defendants' Sixth Amendment right to a fair trial, that motion is DENIED.

#### Background

The multi-count indictment in this case charges that various officials of the City of Providence (the "City") and others participated in a RICO conspiracy to solicit and pay bribes in order to do business with the City and/or to obtain favorable treatment from certain city agencies.

In April 1999, Special Agent W. Dennis Aiken, the FBI's chief investigator in this case, applied for a warrant to search Providence City Hall and other locations. In support of that application, Aiken submitted a 95–page affidavit (the "affidavit"). The warrant was authorized by Magistrate Judge Lovegreen who, at the government's request, ordered that the affidavit be sealed.

After the warrant was executed, the *Journal* filed a motion for access to the sealed affidavit and the government objected. On July 29, 1999, Judge Lagueux, to whom this case originally was assigned, denied the *Journal's* motion, primarily on the ground that disclosure would compromise an ongoing criminal investigation.

During the period between Judge Lagueux's ruling and the time that the case was reassigned to this Court, there were several instances in which evidence presented to the grand jury and video tape recordings subject to a protective order entered by Judge Lagueux, were leaked to the media. One of the video tapes, which purported to show one of the defendants accepting a bribe, was broadcast by a local television station and was played by an Assistant United States Attorney for several of his friends.

This Court sanctioned the AUSA and appointed a special prosecutor to determine whether criminal charges should be brought against whomever was responsible for the leaks. In addition, in order to protect the parties' right to a fair trial, on May 15, 2001, an order was entered limiting extra-judicial statements and disclosures.

The *Journal,* now, has renewed its motion for access to the affidavit. The *Journal* argues that it has a right of access to search warrant affidavits that derives from the First Amendment, common law, and/or Federal Rule of Criminal Procedure 41(g). Although the *Journal* concedes that its asserted right is a qualified one, it contends that, because the defendants have been indicted, there no longer is any reason for keeping the affidavit under seal.

The government has withdrawn its objection to the *Journal's* motion and explains the reversal of its position by stating that, although the investigation into alleged city hall corruption is continuing, no additional charges against these defendants are anticipated; and, therefore, it is unlikely that unsealing the warrant will compromise the ongoing investigation.

The defendants continue to object to the *Journal's* motion claiming that the affidavit is replete with unsubstantiated opinions, hearsay, and partisan commentary. They argue that any "right" of access the *Journal* may have is outweighed by the

likelihood that publication of the affidavit will prejudice their Sixth Amendment right to a fair trial.

### Standing

■ There is a real question as to whether the *Journal* has standing to present this motion. Ordinarily, motions may be filed only by the parties in a case or those who have been granted intervenor status.[1] *See In re Globe Newspaper Co.,* 920 F.2d 88, 90 (1st Cir.1990) (holding that because "the Globe was never a party to the criminal proceeding below, and because the right of a non-party to intervene in a criminal proceeding is doubtful, we decline (without deciding if there is, in fact, a right to intervene under these circumstances) to entertain the Globe's appeal from denial of that order").

■ However, although the *Journal* is neither a party nor an intervenor in this case, none of the parties has challenged its standing. Therefore, this Court will proceed to address the merits of the *Journal's* motion.

### Analysis

I. *The Source of the Journal's Right of Access*

■ Generally, both the public and the media have a "right" of access to most documents that are part of a court's file in a pending case. However, that right is not absolute. *Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 598, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978); *Globe Newspaper Co. v. Superior Court,* 457 U.S. 596, 606, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982). It is a qualified right and the circumstances under which access may be limited depend upon the nature of the documents and whether the right emanates from the

First Amendment or from some other source.

### A. The First Amendment

The First Amendment provides that "Congress shall make no law ... abridging the freedom of speech or of the press...." U.S. Const. amend. I. It has been interpreted by the Supreme Court as conferring upon the media a qualified right to attend criminal trials and other court proceedings when "the place and process have historically been open to the press and general public," and where "public access plays a significant positive role in the functioning of the particular process in question." *Press–Enterprise Co. v. Superior Court,* 478 U.S. 1, 8, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986) (conferring qualified right to attend preliminary hearings) [hereinafter *Press–Enterprise II* ]; *see also Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 580, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980) (conferring qualified right to attend criminal trials); *Press–Enterprise Co. v. Superior Court,* 464 U.S. 501, 505, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984) (no relation to *Press–Enterprise II* ) (conferring qualified right to attend voir dire proceedings) [hereinafter *Press–Enterprise I* ].

■ The right of access must be balanced against and may be outweighed by competing rights or societal interests. *See Globe Newspaper Co.,* 457 U.S. at 606, 102 S.Ct. 2613; *Press–Enterprise II,* 478 U.S. at 9, 106 S.Ct. 2735. However, a First Amendment right of access may be overcome only when the restriction " 'is essential to preserve higher values and is narrowly tailored to serve that interest.' " *Press–Enterprise II,* 478 U.S. at 13–14,

---

1. Requests like this one also may be made under the All Writs Act, 28 U.S.C. § 1651, via a petition for a writ of mandamus. *See In re*

*Globe Newspaper,* 920 F.2d 88, 90 (1st Cir. 1990).

106 S.Ct. 2735 (quoting *Press–Enterprise I*, 464 U.S. at 510, 104 S.Ct. 819).

The Supreme Court has not yet had occasion to decide whether the First Amendment also confers on the media a right of access to documents filed in a criminal case, but the First Circuit has applied the *Press–Enterprise II* test in making that determination. Thus, in *Globe Newspaper v. Pokaski,* 868 F.2d 497, 505, 509 (1st Cir.1989), the Court drew a distinction between records relating to proceedings that traditionally have been open to the public and records relating to proceedings that traditionally have not been open to the public. More specifically, the Court in *Pokaski* found that the media had a qualified First Amendment right of access to records in closed criminal cases where the defendant was adjudicated not guilty, *id.* at 505, but not to records in cases where the grand jury had failed to indict because "[i]n contrast to criminal trials, 'grand jury proceedings have traditionally been closed to the public,'" and the "public has no right to attend grand jury proceedings." *Id.* at 509.

The few courts that have decided the precise issue of whether the media have a First Amendment right of access to search warrant affidavits filed in a pending criminal case have applied the *Press–Enterprise II* test, but they have reached different conclusions. The Fourth Circuit has held that, while the media have a qualified right of access to search warrant affidavits, that right emanates from common law and not from the First Amendment. *Baltimore Sun Co. v. Goetz,* 886 F.2d 60, 64–65 (4th Cir.1989). The Ninth Circuit has held that, at least before an indictment is returned, there is no right of access under either common law or the First Amendment. *Times Mirror Co. v. United States,* 873 F.2d 1210, 1214, 1218 (9th Cir.1989) (declining to decide whether right of ac-

cess would exist after indictment returned). The Eighth Circuit, on the other hand, has held that a qualified First Amendment right of access exists but found that the right was outweighed by a substantial probability that disclosure would compromise an ongoing investigation. *In re Search Warrant for Secretarial Area Outside Office of Gunn,* 855 F.2d 569, 573–74 (8th Cir.1988).

In each case, the court determined that the first prong of the *Press–Enterprise II* test had not been satisfied because, historically, proceedings to obtain search warrants have been conducted *ex parte* and have not been open to the public. *Baltimore Sun Co.,* 886 F.2d at 64; *Times Mirror Co.,* 873 F.2d at 1214; *Gunn,* 855 F.2d at 573. Nevertheless, in *Gunn,* the Eighth Circuit concluded that the documents filed in support of search warrant applications are public records because they "are routinely filed with the clerk of court without seal." *Gunn,* 855 F.2d at 573.

■ This Court finds the Fourth Circuit's reasoning in *Baltimore Sun Co.* to be most persuasive and respectfully disagrees with the rationale expressed in *Gunn.* As the Ninth Circuit stated in *Times Mirror Co.,* the fact that some search warrant documents are filed unsealed does not establish a "history of unrestricted access to warrant material" because the government "has always been able to restrict access to warrant materials by requesting a sealing order, which courts have granted freely upon a showing that a given criminal investigation requires secrecy." *Times Mirror Co.,* 873 F.2d at 1214. Put another way:

the fact that search warrants and supporting affidavits are often filed with the district court without seal ... merely describes a practice in cases where the government presumably believes secrecy

is unnecessary; it does not establish that the First Amendment requires that warrant materials be filed without seal. *Id.* at 1217.

### B. *Common Law*

■ Although the media have no *constitutional* right of access to search warrant affidavits, they do have a qualified *common law* right of access to judicial records, in general. *Nixon v. Warner Communications*, 435 U.S. 589, 597–99, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978). Since Federal Rule of Criminal Procedure 41(g) requires that warrant documents be filed with the clerk of court, and since those documents become part of the court file they, clearly, are judicial records. *See Baltimore Sun Co.*, 886 F.2d at 63–64.

■ The common law right of access may be restricted upon a somewhat lesser showing than would be required to restrict a First Amendment right of access. As the Fourth Circuit stated in *Baltimore Sun Co.:*

> ... the decision to grant or deny access is "left to the sound discretion of the trial court, a discretion to be exercised in light of the relevant facts and circumstances of the particular case."

*Baltimore Sun Co.*, 886 F.2d at 64; *see also Nixon*, 435 U.S. at 598, 98 S.Ct. 1306 ("[T]he right to inspect and copy judicial records is not absolute. Every court has supervisory power over its own records and files....")

### C. *Rule 41(g)*

Federal Rule of Criminal Procedure 41(g) provides:

> (g) Return of Papers to Clerk. The federal magistrate judge before whom the warrant is returned shall attach to the warrant a copy of the return, inventory and all other papers in connection therewith and shall file them with the clerk of the district court for the district in which the property was seized.

■ The manifest purpose of that provision is to preserve those warrant documents that may be needed by the defendant in order to challenge the validity of the search via a motion to suppress and/or in order to file a motion for return of the seized property pursuant to Rule 41(e). *See Times Mirror Co.*, 873 F.2d at 1220; *cf. In re Search Warrant for Second Floor Bedroom*, 489 F.Supp. 207, 208 n. 1 (D.R.I.1980) (finding that public and media also intended beneficiaries of rule).

On its face, Rule 41(g) does not require disclosure of search warrant affidavits. Nor is there anything in the Advisory Committee notes or the legislative history of the rule indicating that it was intended to create any right of access to search warrant affidavits or to expand any right of access that, otherwise, might exist. *See Times Mirror Co.*, 873 F.2d at 1214 n. 5 & 1220. If such substantive changes had been intended, or if Rule 41(g) had been intended to prohibit courts from continuing the well-established practice of sealing warrant materials when justification for doing so exists, one would expect that intent to be reflected in the rule and/or the record of proceedings that resulted in its adoption. *Id.* at 1220. The absence of any such indication strongly suggests that:

> Rule 41(g) is administrative in nature, and merely "facilitates observance of th[e common law] right [of access] by directing the judicial officer to file all papers relating to the search warrant in the clerk's office."

*In the Matter of Eyecare Physicians of America*, 100 F.3d 514, 517 (7th Cir.1996) (quoting *Baltimore Sun Co.*, 886 F.2d at 65).

■ In short, although Rule 41(g)'s requirement that search warrant affidavits

be filed with the clerk makes them judicial records to which a qualified common law right of access attaches, the circumstances under which access may be limited is a matter that is "committed to the sound discretion of the judicial officer." *Baltimore Sun Co.*, 886 F.2d at 65.

### III. *Applying the Test*

Here, it is immaterial whether the *Journal's* right of access derives from the First Amendment or from common law. In either event, the right is a qualified right. Moreover, the facts of this case are such that maintaining the search warrant affidavit under seal satisfies both the common law "sound discretion" test and the more stringent "strict scrutiny standard" established by *Press–Enterprise II.*

### A. *Probability of Prejudice*

■■■■ The interest in preventing an ongoing investigation from being compromised is one of the "higher values" that may outweigh the media's right of access in pending criminal prosecutions, *Baltimore Sun Co.*, 886 F.2d at 64, but it is not the only one. Media access also may be restricted in order to protect the defendant's Sixth Amendment right to a fair trial. *See Gannett Co. v. DePasquale,* 443 U.S. 368, 392–93, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979); *Press–Enterprise II,* 478 U.S. at 9, 106 S.Ct. 2735 ("[When] the right of the accused to a fair trial might be undermined by publicity . . . the trial court must determine whether the situation is such that the rights of the accused override the qualified First Amendment right of access."). Such restrictions may be imposed "only if specific findings are made demonstrating that, first, there is a substantial probability that the defendant's right to a fair trial will be prejudiced by publicity that closure would prevent and, second, reasonable alternatives to closure cannot

adequately protect the defendant's fair trial rights." *Press–Enterprise II,* 478 U.S. at 14, 106 S.Ct. 2735.

■■■■ Generally, the probability of prejudice is greater with respect to the disclosure of search warrant affidavits than it is with respect to disclosure of other kinds of documents. By their very nature, search warrant affidavits frequently contain statements that, if widely disseminated, could seriously threaten a defendant's right to a fair trial.

■■■■ The purpose of such affidavits is to persuade a judicial officer that an accused has committed a crime and that the requested search will reveal evidence of that crime. Unlike motions, pleadings, and other documents filed in a case, search warrants are not submitted by attorneys; and, therefore, they are not subject to the rules that prohibit attorneys from publicly making pretrial statements that may unfairly prejudice an accused's Sixth Amendment rights. *See* Local Rule 39; R.I. Rule of Prof. Conduct 3.6.

■■■■ Nor is there anything that restricts the contents of an affidavit to factual allegations or to matters relevant to determining whether probable cause exists for the issuance of a warrant. As long as the affidavit contains statements that are sufficient to establish probable cause, it may include opinions, conclusions, and whatever other matters that the affiant chooses to incorporate.

In addition, search warrant affidavits often contain statements or information attributed to other persons, some of whom may be anonymous. Such hearsay statements would be inadmissible at trial.

Moreover, search warrant affidavits are submitted *ex parte* and, except in rare cases, the defendant has no opportunity to challenge the statements that they contain. Affidavits call for no response and, in most

cases, no response is permitted other than to contest whether the affidavit, on its face, establishes probable cause for issuing a warrant.

Even if a vehicle for responding existed, counsels' ability to effectively respond would be constrained by the Rules of Professional Conduct and the Local Rules of this Court, which prohibit attacks on the character and credibility of witnesses and other extra-judicial statements that are likely to interfere with a fair trial. *See* R.I. Rule of Prof. Conduct 3.6; Local Rule 39. Any response, also, would invite a rejoinder by the government and would cause the pretrial proceedings to degenerate into an escalating exchange of charges and counter-charges in which the parties vie for favor in the eyes of the public from which the jury will be drawn. The result would be a circus-like atmosphere that would threaten prospects for a fair trial.

█ Generally, in run-of-the-mill cases, the pretrial release of search warrant affidavits does not seriously threaten a defendant's Sixth Amendment rights because, ordinarily, such affidavits are not widely publicized. However, clearly, that is not true in this case. The understandably intense media coverage of this case virtually assures that, if the Aiken affidavit is unsealed, its contents will be published and broadcast throughout the state and among the pool of prospective jurors. Furthermore, this Court would have no way to control the timing of the resulting publicity. Thus, it is easy to envision a scenario in which the contents of the affidavit would be featured in media reports on the eve of trial when the risk of tainting the pool of potential jurors is greatest.

The likelihood that widespread publicity will prejudice these defendants' right to a fair trial is heightened by the unusually prejudicial nature of this affidavit, which differs markedly from most search warrant affidavits in several respects.

First, the affidavit contains many statements that appear to have little bearing on whether probable cause existed to search the locations in question. The inclusion of such superfluous statements is the principal reason that the affidavit is an unprecedented 95 pages long.

The affidavit also contains more statements attributed to third parties and anonymous sources than are found in a typical search warrant affidavit, as well as an inordinate number of what are nothing more than the affiant's conclusions and opinions. For example, in some places it purports to describe what defendants were thinking. Most of these hearsay statements, opinions, and conclusions are highly prejudicial and would be inadmissible at trial.

In addition, the affidavit is written in a uniquely inflammatory style. It has a storybook format and is liberally interspersed with evocative headings and characterizations. Some of the headings that already have been made public, such as "Money Laundering Needs to be Done Right," "The Only Thing Cianci Worries About is Money," and "Corrente: 'Absolutely They Know What the F* * * I Mean,'" are illustrative.

Furthermore, the affidavit contains derogatory statements about individuals who have not been charged that are unsubstantiated and that, even the government concedes, should not be made public.

Although it may be permissible to include statements like these in a search warrant affidavit, it is not permissible to allow them to be widely disseminated among the pool of prospective jurors when doing so would create a substantial risk of prejudicing the defendants' right to a fair

trial which is, precisely, what this Court finds would occur in this case.

## B. *The Alternatives*

The *Journal* contends that any danger that the defendants' Sixth Amendment rights would be infringed by publication of the affidavit could be mitigated in several ways.

■ First, the *Journal* argues that the passage of time between the unsealing of the affidavit and the trial would dissipate any prejudicial effect that publication of the affidavit's contents might have on the defendants' right to a fair trial. That argument rests on the dubious premise that, by the time of trial, potential jurors will have forgotten what they read or heard. However, even if the memory of potential jurors is as fallible as the *Journal* suggests, there is no way to insure that the statements contained in the affidavit will not be republished by the *Journal* or aired by other media outlets on the eve of trial, thereby refreshing the jurors' memories.

■ The *Journal* also argues that the affidavit could be redacted to eliminate information that would unfairly prejudice the defendants' right to a fair trial. However, like Judge Lagueux, I find that the allegations in the affidavit are so intertwined that it would be impossible to redact it in that manner. *See Gunn*, 855 F.2d at 574; *Baltimore Sun Co.*, 886 F.2d at 65.

■ The *Journal* further argues that prospective jurors who may have been influenced by publication of the affidavit's contents could be eliminated during voir dire. However, given the massive publicity surrounding this case, the number of prospective jurors eliminated is likely to be substantial. Such systematic exclusion of large numbers of these potential jurors who are most inclined to read newspapers and listen to news broadcasts would threaten the defendants' right to a jury comprised of a fair cross-section of the community.

■ Finally, the *Journal* argues that, failing all else, the defendants' right to a fair trial could be preserved by postponing the trial or by a change of venue. In effect, this amounts to a less than satisfactory proposal that the defendants be required to sacrifice one right (i.e., the right to a speedy trial or the right to a trial in the district where the offenses allegedly were committed and where they are more likely to find a jury of their peers) in order to preserve another right (i.e., the right to a fair trial before an impartial jury).[2]

## C. *Striking a Balance*

■ In attempting to strike an appropriate balance between the *Journal's* qualified right of access and the defendants' constitutional right to a fair trial, a court must consider not only the relative importance of those competing rights; but, also, the extent to which each right would be infringed. Here, it is clear that any infringement of the defendants' right to a fair trial caused by publication of the affidavit would be total and permanent. Once lost, the right cannot be restored. By contrast, to the extent that the *Journal's* right of access is impaired by maintaining

2. Recent Rhode Island history provides several apt illustrations of how massive pretrial publicity can affect the conduct of the trial of public figures. Several years ago, the trial of the reputed head of organized crime in New England had to be postponed for three consecutive six-month periods due to last-minute prejudicial pretrial publicity. In addition, the prosecution of a former speaker of the Rhode Island House of Representatives had to be moved to the District of Massachusetts because of the likelihood that the potential jury pool had been tainted by intense pretrial publicity.

the affidavit under seal, such impairment will be more limited and transitory. If there is evidence to support the allegations, opinions, and conclusions set forth in the affidavit, such evidence presumably will be presented by the government at trial in open court where it will be accessible to all. Moreover, whether or not such evidence is presented, there would be no reason to keep the affidavit under seal once the threat to the defendants' right to a fair trial has passed. Thus, any infringement on the *Journal's* right of access caused by denying the motion to unseal the affidavit, at this time, will be of limited duration.

Both the Supreme Court and the First Circuit have recognized that delaying the release of documents is one method of striking an appropriate balance between a defendant's right to a fair trial and the media's right of access. *See Gannett Co. v. DePasquale,* 443 U.S. 368, 393, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979) (approving denial of access for temporary period because "[o]nce the danger of prejudice has dissipated, a transcript of the suppression hearing was made available"); *In re Globe Newspaper,* 729 F.2d 47, 57 (1st Cir.1984) ("[T]he harm in delayed access is not as great as that in denied access.").

IV. *Conclusion*

To summarize, this Court finds that allowing the *Journal* and other media to have access to the affidavit, at this time, would create a "substantial probability" of prejudice to the defendants' Sixth Amendment right to a fair trial. This Court further finds that keeping the affidavit under seal, at least until the time of trial, is the only reasonable means available to ensure that such prejudice does not occur and that the defendants' right to a fair trial is adequately protected. Finally, this Court finds that the temporary restriction on the *Journal's* qualified right of access caused by maintaining the affidavit under seal is outweighed by what could be the irrevocable loss of the defendants' constitutional right to a fair trial if the affidavit is unsealed. Therefore, the *Journal's* motion for access is DENIED.

IT IS SO ORDERED.