**GLOBE NEWSPAPER CO.,**
**et al., Plaintiffs,**

v.

**John E. FENTON, Jr., as he is Chief Administrative Justice of the Trial Courts of the Commonwealth of Massachusetts, et al., Defendants.**

**Civ. A. No. 89–2868–WD.**

United States District Court,
D. Massachusetts.

March 29, 1993.

Deborah Kravitz, Bingham, Dana & Gould, Boston, MA, for plaintiffs.

Peter Sacks, Atty. General's Office, Boston, MA, for defendants.

## MEMORANDUM AND ORDERS

WOODLOCK, District Judge.

The cross motions for summary judgment before me put in issue the relative accessibility of closed criminal case files maintained in each of the 83 criminal trial courts of the Commonwealth of Massachusetts.

The defendant state custodians of these records concede that the First Amendment protects the right of any news reporter or member of the public to come to "any Massachusetts trial court clerk's office and immediately examine as many such files as he or she wishes ... because this sort of access plays a significant positive role in monitoring the fairness, efficiency, and overall performance of the Massachusetts criminal court system." *Memorandum in Support of Defendant's Cross–Motion For Summary Judgment* (*"Defendant's Memorandum"*) at 1. However, acting pursuant to a relatively recent privacy regime, the Criminal Offender Record Information System, Mass.Gen.L. ch. 6 §§ 167–178B ("CORI"), they decline to permit unrestricted access to the alphabetical indices of parties, a convenient—formerly public—record which the Commonwealth has required trial court clerks to maintain since before ratification of the United States Constitution.[1]

The defendants' concession of the public's constitutional entitlement to court documents, when coupled with their refusal to allow the public an effective opportunity to

---

**1.** Although differences exist among the record keeping systems within the 83 trial courts, in general the alphabetical indices list the names of criminal defendants and the docket numbers that correspond to the cases in which the defendants have been involved. A docket number in turn leads to a docket sheet which

> typically contains ... [a statement of] the charges brought against the defendant, the dates of hearings and other events in the case and sometimes a brief entry describing the event which occurred or action taken, the disposition of the charges and the sentence, if applicable.

*Globe Newspaper Co. v. Pokaski,* 868 F.2d 497, 499 n. 4 (1st Cir.1989) (citation omitted). Moreover, docket sheets generally provide the names of the judge or judges, the prosecutors, defense counsel (whether appointed or not) and provide a chronology making it possible to determine how long it took to complete various stages of the proceeding. From the docket sheets it is possible to identify what papers in the case file may relate to particular action that took place during the proceeding.

make use of the single most meaningful index to those documents in the courthouse, calls to mind Justice Jackson's description of another state scheme burdening a constitutional right the state was required to affirm. Unless access to court records is secured by an order mandating disclosure of the alphabetical indices, the Commonwealth's acknowledgment of First Amendment protection to closed criminal files will remain "only a promise to the ear to be broken to the hope, a teasing illusion like a munificent bequest in a pauper's will." *Edwards v. California,* 314 U.S. 160, 186, 62 S.Ct. 164, 172, 86 L.Ed. 119 (Jackson, J. concurring).

Consequently, I will allow the motion of the plaintiff by declaring unconstitutional that aspect of the Massachusetts scheme pursuant to which the defendants and their subordinates have acted to deny access to the alphabetical indices maintained by the courts. Moreover, in order to insure that the CORI scheme will not otherwise cause indirectly an effective restriction in public access to criminal offender record information, I will also allow plaintiffs' motion by declaring that CORI may not be used to impose sanctions on any person for dissemination of offender information then available in judicial records open to the public.

–A–

## FIRST AMENDMENT ACCESS

■ It is settled as a general proposition in "[t]his circuit, along with other circuits, [that there has been] established a First Amendment right of access to records submitted in connection with criminal proceedings." *Globe Newspaper Co. v. Pokaski,* 868 F.2d 497, 502 (1st Cir.1989) (citations omitted). The Supreme Court has made clear that the question whether to afford public access to materials generated by a criminal proceeding is to be answered by reference to a two step analysis involving "considerations of experience and logic."

*Press–Enterprise Co. v. Superior Court,* 478 U.S. 1, 9, 106 S.Ct. 2735, 2740, 92 L.Ed.2d 1 (1986); *see also Rivera–Puig v. Garcia–Rosario,* 983 F.2d 311, 314 (1st Cir.1992). First, there must be an inquiry into the historic availability of the materials; second, there must be inquiry into whether such availability "plays a significant positive role in the functioning of the particular process in question." *Id.*

If the two step analysis yields the conclusion that access to the material is presumptively open and public, a third dimension of inquiry is appropriate. Termed by the First Circuit in *Pokaski* "the traditional compelling interest/least restrictive means test,"[2] 868 F.2d at 505, the purpose of this inquiry is to determine whether the restriction on public access can

> satisfy three requirements. First, the objectives of the statute must be sufficiently important; second, the means chosen by the state must effectively promote the statute's objectives; and third, the statute must not infringe upon the First Amendment any more than is necessary to promote those objectives.

868 F.2d at 505.

### 1. *Historic Access*

■ The right of public access to court records including indices was recognized at the very beginning of the development of the Massachusetts courts. When directing in 1639 that records should be kept of all judicial proceedings the General Court took care to provide that "every Inhabitant of the Country shall have free liberty to search and view any Rolls, Records, or Registers of any Court ..." Bellefontaine & Newman, *The Early History of the Massachusetts Supreme Judicial Court,* 1990 Annual Report of the Supreme Judicial Court Historical Society 5, 6 (1991).

In 1786 the Great and General Court—the legislature—of Massachusetts imposed a

---

**2.** The *Pokaski* court explained that by requiring the state to impose only the least restrictive statutory scheme, it was invoking the traditional rule that, when state law burdens a fundamental First Amendment right—as access to court records of criminal proceedings advancing beyond the first

two steps of analysis would be—the law must be narrowly tailored to its goals. 868 F.2d at 505 n. 15 (citing *Globe Newspaper Co. v. Superior Court,* 457 U.S. 596, 607, 102 S.Ct. 2613, 2620, 73 L.Ed.2d 248 (1982), for "narrowly tailored" language).

statutory duty on the clerks of the various courts of the Commonwealth

> to keep up the Records of the said Court, or such part thereof, as shall by the said Court be assigned him, seasonably and in good order: and also to make and keep convenient and correct alphabetts (sic), to the said Records.

1786–87 Mass. Acts, ch. 57 (1786). The legislative intent behind this statutory direction was manifest. The increasing numbers of cases required a relatively basic index for effective access to the files.[3]

The legislative mandate that the clerks maintain alphabetical indices has continued uninterrupted for the past two centuries and is now codified at Mass.Gen.L. ch. 221 § 23, which provides:

Each clerk shall keep an alphabetical list of the names of all parties to every action or judgment recorded in the records and a reference to the book and page thereof; and, if there are two or more plaintiffs or defendants, the name of each and a like reference shall be inserted in its appropriate place in the alphabetical list.

To be sure, there were—and continue to be—practical limitations on the availability and actual preparation of alphabetical indices by the various clerks offices throughout the Commonwealth.[4] But it is apparent that when the offices were open such indices as the clerks had prepared were made accessible to the public. By modern times the record keeping practices of the clerks offices had, with predictable idiosyncratic exceptions, crystallized into a general pattern for closed criminal cases.[5] Closed criminal case

3. A similar right of convenient access through alphabetical indices was contemporaneously recognized as to the records of the federal courts of Massachusetts, which maintained their facilities in courthouses of Suffolk and Essex Counties during the first 85 years after their creation by the First Congress in 1789. *See generally* Woodlock, *The "Peculiar Embarrassment": An Architectural History of the Federal Courts in Massachusetts*, 74 Mass.L.Rev. 268, 268–272 (1989). The Massachusetts—and all other—federal courts have consistently afforded open access to their alphabetical indices throughout their history and to this day. Indeed, for the United States Circuit Court in Massachusetts, the indices began in 1790 when the Circuit Court first began sitting. For the United States District Court, whose business initially was quite limited, indices did not begin until 1806 when the caseload started to require such a convenient mechanism for records search.

It bears noting that the CORI scheme purports to embrace any "federal court with criminal jurisdiction" within its scope. 803 CMR § 203 (federal court included within definition of "criminal justice agency" subject to various regulatory responsibilities). It does not appear that the state has ever attempted to enforce CORI limitations on a federal court and there appears to be substantial question, given the preemptive effect of contrary federal law and practice, whether the state would have the power to do so. *See generally Securities Industry Ass'n. v. Connolly*, 703 F.Supp. 146 (D.Mass.1988), *aff'd* 883 F.2d 1114 (1st Cir.1989), *cert. denied*, 495 U.S. 956, 110 S.Ct. 2559, 109 L.Ed.2d 742 (1990).

4. The defendants contend that at least in the years immediately surrounding the enactment of the Constitution, court records were largely inaccessible because the courts did not sit for as many as ten months out of the year and the case

file record system was quite complex. The historical evidence, however, suggests at most that practical difficulties—as distinguished from public records policy—limited the actual availability of closed criminal files. Those difficulties are not different in kind from current budgetary limitations on the hours of courthouse operation and the staffing of clerks offices. Such difficulties do not evidence a lack of openness as a matter of policy.

More remarkable is the defendants' historical assertion, without so much as a mention of Chapter 57 of the Acts of 1786, that "there simply were no alphabetical indices of the type to which the Globe seeks to establish a right of access in this case." *Defendants' Memorandum* at 12. The historical evidence does not support this assertion. Rather it appears that the initial development of the "alphabetts" mandated by Chapter 57 and its successor legislation were not as systematic as they have become during the past two centuries.

5. The various unique and exceptional methodologies employed within the several Massachusetts trial courts come close to overwhelming the general pattern. For example, the Superior Courts in Essex and Worcester counties keep the docket sheets for closed cases in alphabetical order, thus obviating the need for separate alphabetical indices. In other courts, limitations on staff and resources have from time to time affected the pattern as well. For example, since 1985 it has been the policy in the Massachusetts District Courts to keep docket sheets with the closed case files to which they relate rather than in bound volumes. Nevertheless, the general pattern described above more or less captures the predominant practice throughout the Massachusetts court system.

files were referenced in docket sheets; the docket numbers for these cases were assigned in various inconsistent and changing ways over the years but were largely in chronological order; the docket sheets for the cases were gathered together in chronological order in docket books. Since the number of docket sheets would climb well into the thousands, the most efficient means to gain access to the docket books—if the docket number was unknown—was to consult the alphabetical index the clerk was required to keep. All of the relevant documents—including the alphabetical indices—were open to the public.

A countervailing legislative mandate regarding court indices was enacted in the 1970's, nearly two hundred years after the Great and General Court directed maintenance of "convenient and correct alphabetts" to court records. That mandate, as expressed in CORI and implemented by the Commonwealth's courts through Administrative Directive 1–84—the two specific provisions challenged here—directs that "no alphabetical or similar index of criminal defendants [be] available to the public, directly or indirectly." Mass.Gen.L. ch. 6, § 172.

The "purpose and practical effect of the denial of public access to the alphabetical index" was concededly "to deny effective access to the records" maintained by trial court clerks. *New Bedford Standard–Times Publishing Co. v. Clerk of the Third District Court*, 377 Mass. 404, 414, 387 N.E.2d 110 (1979). This desired effect was in furtherance of the fundamental policy of CORI to resolve the conflict "between the individual's interest in privacy and confidentiality and the public's access to records of past criminal proceedings," *id.* at 413, 387 N.E.2d 110, by seeking to protect the privacy interests of

criminal defendants after the cases against them had terminated. The Supreme Judicial Court of Massachusetts in its 1979 *New Bedford Standard–Times Publishing Co.* decision found nothing in the First Amendment to bar CORI's implementation of this policy.

A year later the Supreme Court of the United States struck a balance more clearly favoring First Amendment access as opposed to privacy interests in the conduct of criminal proceedings. *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980). The case law which has developed since *Richmond Newspapers* has reinforced a setting of the balance to favor First Amendment interests. *See, e.g. Press Enterprise, supra; Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982); *Pokaski, supra*. The Commonwealth's legislative policy of seeking to enhance privacy by denying effective access to the records of closed criminal proceedings, however, has not changed.[6] Consequently the constitutionality of privacy restrictions must be addressed again in this context where the historic right of access to alphabetical indices was firmly established before and continued well after the enactment of the First Amendment.

### 2. Role in the Process

As the First Circuit recognized in *Pokaski*, the basis for the First Amendment right of access to records generated in criminal proceedings "is that without access to documents the public often would not have a 'full understanding' of the proceeding and therefore would not always be in a position to serve as an effective check on the system." 868 F.2d at 502. Of course, as in *Pokaski*, recognition of that role does not end the inquiry because the precise question for resolution here is not whether there is a right to access the records

---

**6.** Amendments to CORI in 1990, 1990 Mass.Acts ch. 319, have expanded somewhat the public's access to criminal history information. For one week after conviction and sentencing, all records related to a criminal case—presumably including alphabetical indices—have become available for inspection. *Id.* at § 12 (amending Mass.Gen.L. ch. 6, § 172). All records relating to a deceased defendant have also become available. *Id.* at § 17 (inserting Mass.Gen.L. ch. 6, § 178B). In addition, conviction data relating to convicted defendants is available—for a fee of $25 per

request for members of the public, *id.* at § 13 (inserting Mass.Gen.L. ch. 6, § 172A)—upon application to the Criminal History Systems Board, provided generally that the defendant is either incarcerated, under supervision or has been released from custody or supervision for not more than one year for misdemeanors or two years for felonies. *Id.* at § 12 (amending Mass.Gen.L. ch. 6, § 172). These amendments, however, do not evidence a fundamental change in the underlying policy of CORI substantially to restrict public access to court records.

but whether the restrictive access provided is constitutionally adequate for the public. Nevertheless, a more complete understanding of the importance of the role public access to court records plays is necessary when evaluating the constitutionality of any restrictions in light of the practical effectiveness of the access actually provided.

The relevant considerations were outlined by the Supreme Court of the United States in *Richmond Newspapers*, after the Massachusetts Supreme Judicial Court upheld the regime of restrictions at issue here. Speaking of the significant role that openness of trials plays in the functioning of the criminal justice system, the Court identified factors equally applicable to the need for open access to the records of those events. Public access to trials provides "assurance that the proceedings were conducted fairly," 448 U.S. at 569, 100 S.Ct. at 2823, discourages "perjury, the misconduct of participants, and decisions based on secret bias or partiality," *id.*, and contributes to "public acceptance of both the process and its results" by facilitating the "prophylactic aspects of ... community catharsis" based upon awareness that the appropriate organs of government have responded to allegations of criminal conduct. *Id.* at 571, 100 S.Ct. at 2824. Moreover, continued effective access "to the records of completed cases is also necessary to ensure that the government's official records accurately reflect what actually transpired." *Pokaski*, 868 F.2d at 503, n. 12.

The collection of judicial records even in the less busy courthouse is substantial. Throughout the courts a sprawling amalgam of papers reflects action in connection with judicial proceedings. It is not misleading to think of courthouse papers as comprising a vast library of volumes for which docket sheets are the tables of contents. Without the card catalogue provided by alphabetical indices, a reader is left without a meaningful mechanism by which to find the documents necessary to learn what actually transpired in the courts. The indices thus are a key to effective public access to court activity. And the importance of public access to the proper functioning of our judicial system cannot be overstated.

The First Circuit's observation in *Pokaski* that "the present prospect of future access is a felt presence, just as the prospect of appellate review is for the lawyers and judge in the trial of a case," *id.* at 503–04, reflects the recognition that for the judicial system as other human enterprises, in Justice Brandeis' arresting phrase: "Sunlight is said to be the best of disinfectants; electric light the most efficient policeman." L. Brandeis, *Other People's Money* 62 (Nat'l Home Lib. Found. ed. 1933).

Chief Justice Stone, in dismissing the suggestion that "criticism of judicial action involves any lack of respect for the courts," noted that "the only protection against unwise decisions and even judicial usurpation, is careful scrutiny of their action and fearless comment upon it." A.T. Mason, *Harlan Fiske Stone: Pillar of the Law* 398 (1956). Such scrutiny is especially important in connection with criminal proceedings. As Justice Frankfurter once observed, "[o]ne of the demands of a democratic society is that the public should know what goes on in courts by being told by the press what happens there, to the end that the public may judge whether our system of criminal justice is fair and right." *Maryland v. Baltimore Radio Show, Inc.*, 338 U.S. 912, 920, 70 S.Ct. 252, 256, 94 L.Ed. 562 (1950) (Opinion of Frankfurter, J.).

It was Justice Frankfurter who admonished that "[j]udges as persons, or courts as institutions, are entitled to no greater immunity from criticism than other persons or institutions ... [J]udges must be kept mindful of their limitations and of their ultimate public responsibility by a vigorous stream of criticism expressed with candor however blunt." *Bridges v. California*, 314 U.S. 252, 289, 62 S.Ct. 190, 206–07, 86 L.Ed. 192 (1941) (Frankfurter, J., dissenting). That criticism is valuable in direct relation to the degree it is informed. Consequently, restricted access to relevant records can only result in less valuable criticism of the courts as institutions.

At its foundation, the presumption of openness affirmed in *Richmond Newspapers* and its progeny is designed to vindicate the central purpose of the First Amendment by making the operations of government institu-

tions subject to effective public scrutiny. This purpose is designed to the end that our governmental institutions will be accountable to the public upon whose consent the authority of all democratic institutions—including the courts—must rest. *See generally*, Lewis, *A Public Right to Know About Public Institutions: The First Amendment as Sword*, 1980 S.Ct.Rev. 1.

The importance of public access to the workings of the criminal justice system for our democratic institutions was recently reaffirmed by the majority and minority opinions in *Gentile v. State Bar of Nevada*, —— U.S. ——, 111 S.Ct. 2720, 115 L.Ed.2d 888 (1991). In the words of Chief Justice Rehnquist, joined by Justices White, O'Connor, Scalia and Souter:

> the criminal justice system exists in a larger context of a government ultimately of the people, who wish to be informed about happenings in the criminal justice system, and, if sufficiently informed about those happenings, might wish to make changes in the system.

*Id.* —— U.S. at ——, 111 S.Ct. at 2742.

A similar view was expressed by Justice Kennedy, joined by Justices Marshall, Blackmun and Stevens:

> The judicial system, and in particular our criminal justice courts, play a vital part in a democratic state, and the public has a legitimate interest in their operations.

*Id.* —— U.S. at ——, 111 S.Ct. at 2724.

The role public access to court records generally plays in the proper functioning of accountable institutions, particularly the courts as institutions, is graphically illustrated by the activities of the plaintiffs in dealing with such records. More particularly, the plaintiffs' experience demonstrates the critical importance of indices for effective access to otherwise public court records.

The plaintiff O'Neill is the editor of the plaintiff Boston Globe's Spotlight Team, a group of reporters and researchers whose activities appear designed to make, in the words of the First Circuit in *Pokaski*, a "contribution to governance" by "investigative reporting aimed at exposing bribery, ex parte dealings, and judicial or other miscon-

duct in connection with the disposition of criminal cases." *Pokaski*, 868 F.2d at 504. Among the Team's investigations reflected in the record are:

a) a 1984 series concerning defaults in the Massachusetts criminal courts, a problem the Team concluded was "[l]argely ignored by police, prosecutors and judges." *Without fear of capture, many default on criminal charges*, Boston Globe, Sept. 23, 1984 at 1;

b) a 1986 series on the treatment of drunk driving offenses in the courts, where the Team found judicial "failure to impose the tough penalties the law requires" and prosecutorial "undercutting [of] the law." *Mandatory terms for drunk drivers often a mirage*, Boston Globe, Nov. 23, 1986 at 1, 46;

c) a 1987 series on child sexual abuse in which the Team concluded that "despite the onslaught of juvenile and adult cases, there has been barely a stir of action from many district attorneys, the courts and the Dukakis administration about a new public safety and penology issue." *Victims' private horror creates a public dilemma*, Boston Globe, Nov. 8, 1987 at 1;

d) a lengthy article in 1989 on state prosecutions of political corruption cases highly critical of the efforts of several state prosecutorial offices in pursuing such offenses, *State stumbles in pursuit of political corruption*, Boston Globe, Dec. 10, 1989 at 1;

e) a 1990 series on the Massachusetts criminal trial courts focussing on the unusual success of certain politically influential lawyers when appearing before certain judges; this series precipitated an investigation by the Supreme Judicial Court of Massachusetts through a Special Master and resulted in disciplinary actions regarding certain court personnel, *Despite caseload, many judges work short day*, Boston Globe, Sept. 23, 1990 at 1.

The plaintiffs made use of a wide variety of research and investigative techniques to develop these stories. But one technique which was barred to them was the use of alphabetical indices to pursue leads concerning named defendants for whom they had no docket numbers.

Plaintiff O'Neill has detailed the frustration wrought, and the time and resources consumed, in attempting to develop defendant specific information through court records without alphabetical indices. In the political corruption investigation, for example, the Team was confronted with the prospect of searching through vaults containing collections of closed case files or volumes of docket books. O'Neill concluded that "it was like looking for a needle in a haystack ... because the books might not even contain the cases I was seeking." O'Neill Aff. at ¶ 8. The difficulties of working through such a mass of undifferentiated material without an index caused O'Neill to conclude that proceeding with research in this fashion "would have seriously delayed the Spotlight Teams' newsgathering efforts and publication and would have been unduly burdensome." *Id.; see also* ¶¶ 6, 9, 10.

The lack of alphabetical indices were not the only impediments to court records research the plaintiffs encountered. Several district attorneys, contending that they were subject to CORI strictures, declined to provide the plaintiffs with the docket numbers they sought to access the court files.

To have credibility and pointedness, evaluations of the criminal justice system often need defendant-specific examples. The constraints of the CORI system materially interfere with the plaintiffs' ability to marshall such examples. There may be differences of opinion regarding how many additional person hours are consumed in the wholesale search of judicial records without a simple alphabetical index. And there may be differences of opinion about how much additional direct or indirect cost the CORI constraints

place on the search of otherwise public judicial records.[7] But there can be no meaningful disagreement with the proposition that the ban on public access to alphabetical indices imposes a substantial burden on the ability of the press to provide fully developed criticism of the institutions which administer criminal justice through the Massachusetts state courts.

Access to alphabetical indices can play a significant and positive role in the ability of the citizens of Massachusetts to learn about what is going on in their criminal court system. The CORI system burdens that role. The inquiry now becomes whether the burdens CORI creates are narrowly tailored to serve compelling state interests.

### 3. Tailoring the Means to the Ends

a. *Importance of Restrictive Objectives*— Broadly stated, the objectives of the Massachusetts privacy scheme are both rational and important to the Commonwealth. As the Supreme Judicial Court in *New Bedford Standard Times* noted, it is the statutory policy of Massachusetts to provide individuals with "protection against unreasonable, substantial or serious invasions of privacy," 377 Mass. at 414, 387 N.E.2d 110 (*citing* Mass.Gen.L. ch. 214, § 1B (internal quotations omitted)). These privacy interests weigh heavily for an individual "particularly if he was not convicted. In cases of conviction that interest is reinforced by the public interest in rehabilitation." *Id.* The Commonwealth claims that "immediate, uncontrolled defendant-specific access to closed criminal files" would result in "extreme embarrassment and humiliation" and "severe professional and economic hardship." This,

7. For its part, the Commonwealth contends that the present opportunities for review of judicial records by the plaintiffs are good enough to provide sufficient bases for their stories. To provide what it repeatedly calls "immediate, uncontrolled defendant-specific" research avenues through alphabetical indices would not, the Commonwealth contends, materially assist the plaintiffs in their role as monitors of the criminal justice system. Rather, the indices would make life easier for those lacking an important public purpose in their judicial record search: credit managers, landlords and employee/personnel directors. The Commonwealth's contentions, which are supported by its own subjective analy-

ses of the efficiency and sufficiency of coverage under an alphabetical index impoundment regime by a resourceful big city newspaper, underscore the dangers of government restrictions on information. It is not a proper business of government in a democracy to discriminate in providing access to public documents on the basis of the government's views on the timeliness, newsworthiness or presentational adequacy of the media's ultimate work product. Nor is it appropriate for the government to erect barriers to public information on the basis that only established and well-funded media will be in a position even to consider surmounting them on a regular basis.

in turn, would frustrate the state's "compelling interest" in "promoting the rehabilitation and reintegration into society of former criminal defendants." *Defendants' Memorandum* at 24.

In the words of the Commonwealth

An arrest record, and, *a fortiori,* a conviction record, may be a serious obstacle to obtaining employment, housing and credit, as well as being damaging to a defendant's reputational and associational interests, on which access to many of the other benefits of a civilized society may turn. Arrestees and convicted defendants who are denied employment, housing, and/or credit based on their records are at far greater risk for future criminal conduct.

*Id.* at 26.

These are serious interests forcefully defended and embedded in the statutory public policy of Massachusetts for the past twenty years. The Commonwealth has recently reevaluated the CORI scheme and, as material to this case, has reaffirmed the importance of the underlying interests and the means chosen to further them. Such interests are entitled to careful and sympathetic consideration. Whether they can be accommodated without improperly burdening the federal constitutional interests in access to records of judicial activity is a question which cannot be answered, however, simply by labelling them serious, important or even compelling.

b. *Effectiveness of Chosen Means*—Despite the defendants' somewhat sophistical arguments that the CORI privacy scheme regarding alphabetical indices does not completely deny access to the underlying judicial records, it is apparent that the means chosen approximate that result. Indeed, the Commonwealth's unique [8] system of alphabetical index restrictions are an effective and direct barrier to the underlying records. From all that appears, the Commonwealth's scheme is quite effective in ensuring that for virtually all who seek criminal records of identifiable parties the search is not worth the candle because the process is so burdensome and time consuming any candle will be extinguished before the relevant records are illuminated.

The effectiveness of the Commonwealth's alphabetical index impoundment scheme is clear when it is measured against the alternative methods of access the Commonwealth proposes. The alternatives which the Commonwealth relies upon to demonstrate that the alphabetical index impoundment scheme is no more than minimally restrictive do precisely the opposite. These alternatives are administratively cumbersome, circumstantially limited and unlikely to provide timely or meaningful access to the underlying documents to which the public has a recognized entitlement.

i. *CORI Clearance*—The administrative exercise of seeking clearance from the Criminal History Systems Board under Mass. Gen.L. ch. 6, § 173 is neither guaranteed to be timely nor likely to result in access to information about how the court system treated a particular defendant. Initial research clearances require that a specific defendant's name not be used. This limitation may be lifted only after the requester has initiated a separate request to the Criminal History Systems Board and the Security and Privacy Council under § 172(c) and paid a $25 fee required under § 172A. Thus, putting to one side the customary problems of virtually standardless administrative discretion, the lack of timeliness obligations for a response by the administrative agency and the multiplicitous filing requirements for requesters, it is obvious that CORI clearance, far from being a means of alleviating the restrictiveness of the impoundment scheme, functions to reinforce it.

ii. *Public Presence During Proceedings*—The limited prospect that a member of the public may be present during subject proceedings and able to obtain and recall a docket number for future use is so modest that to call it episodic is substantially to overstate its frequency. As the First Circuit observed in *Pokaski*

---

**8.** It bears noting that the parties have not identified nor has research disclosed any other jurisdiction which has chosen to protect privacy interests by an expedient such as the CORI ban on alphabetical indices.

[i]f the press is to fulfill its function of surrogate, it surely cannot be restricted to report on only those judicial proceedings that it has sufficient personnel to cover contemporaneously.

868 F.2d at 504. The capacity of the press to fulfill its function is not enhanced by a reliance on the presence of nonprofessional observers.

iii. *Participant Recollection*—For precisely the same reason that identifying a particular defendant's involvement in a case with a particular docket number is at the very least burdensome and improbable, so also is the effort to identify and then obtain from a participant the relevant docket information. Even assuming a participant could recall the necessary numbers, there remains the difficulty of obtaining assistance or candor from someone whose activities are presumptively subject to critical examination by the person seeking the information. Moreover, persons who have been participants may—as did the district attorneys plaintiffs contacted in their political corruption investigation—consider themselves barred from disseminating docket numbers to the degree CORI material may thereby be disclosed incidentally. Thus, participant recollection also is not a meaningful alternative to an alphabetical index as a means to access underlying judicial records.

iv. *Daily Lists*—Among the ephemera of court records is the daily list that some, but not all, courts maintain. In the best of circumstances the list is subject to lacunae and modification during the day; it is thus of questionable accuracy and near instant disposability. Moreover, as with the vagaries of public presence and participant recollection, the daily lists, when available, require some initial basic information about time and location of court activity in order to be efficient means for discovery of docket numbers.

v. *Appellate Records*—A particularly sophisticated legal researcher with access to an appellate record database may be able to identify a trial court docket from appellate papers or reports. But this research skill is generally beyond the common capacities of nonlawyers and moreover only permits access to the very limited number of cases which are the subject of appellate review. It is not, as a general proposition, moreover, cases subject to independent appellate review that pose the greatest potential for the abuse public access is intended to guard against.

The impoundment of the alphabetical indices, despite the existence of modest alternative means of access, prevents all but a few sophisticated and persistent members of the public with significant resources from searching effectively for court files to which they have an unquestioned right of access. Thus, CORI satisfies the second requirement of the test outlined in *Pokaski*, 868 F.2d at 505, by achieving the state's goal of insuring the privacy and protecting the rehabilitation and reintegration of defendants. Whether it achieves this result by overburdening the underlying right of access remains to be considered.

c. *Availability of Less Restrictive Means*—Even if the end is compelling, and even if the means chosen are effective, the Commonwealth must still demonstrate that the means are, relative to the constitutional interest of the press and the public, narrowly tailored to the end. Alternatively stated, given the constitutional rights of access, the Commonwealth must have chosen the means of effecting its ends which are least restrictive of the asserted First Amendment rights.

The Commonwealth has not succeeded in that endeavor. By impounding the indices, CORI effectively bars meaningful access to the underlying records by strangers to the litigation in virtually all closed cases. The Commonwealth's interest can legitimately be to bar access in only relatively few closed cases. As the First Circuit has found, it is only in a limited number of cases that the individual's interest in privacy, rehabilitation and reintegration will outweigh the right of the press to access. *Pokaski*, 868 F.2d at 507 ("In most cases, we expect that defendants who request the sealing of records will be unable to make out even a prima facie case for sealing"). Denying access to the most effective means for accessing records in all closed criminal cases can hardly be considered a policy narrowly tailored to advance the Commonwealth's interests in a few such cases. To the contrary, the impoundment of

alphabetical indices appears a subtle and indirect effort to frustrate and undermine the rights of access to court files in criminal cases which *Pokaski* and the line of access cases it advances, *see id.* at 502 n. 9, have been crafted to protect.

Even if the First Circuit in *Pokaski* had not predicted with confidence which way most courts will come out when evaluating on a case-by-case basis the right of access to closed criminal cases, the outcome here would have been foreshadowed. The First Amendment has predetermined which way the scales must tip. In *Globe Newspaper Co. v. Superior Court,* for example, the Supreme Court struck down Massachusetts' mandatory closure rule for cases involving minor victims of carnal crimes in favor of a case-by-case determination. The Court found the state's interest "compelling" and expressed no opinion regarding the likely outcome of the individual determinations; nevertheless, the Constitution was held to make closure permissible only on a specific showing that it was "necessary to protect the State's interest." *Globe Newspaper Co. v. Superior Court,* 457 U.S. at 608–09, 102 S.Ct. at 2621. The Commonwealth is obligated, before a record of a determination of a criminal case may be kept from the public, to require a judicial finding on an adequate record that, with respect to the individual defendant, the document should be kept confidential because of compelling state interests. *Cf. id.* at 609, 102 S.Ct. at 2621 ("In short, § 16A cannot be viewed as a narrowly tailored means of accommodating the State's asserted interest: That interest could be served just as well by requiring the trial court to determine on a case-by-case basis whether the State's legitimate concern for the well-being of the minor victim necessitates closure"). In this way, the Commonwealth will be able to restrict access to criminal records when, but only when, to do so would demonstrably and narrowly serve its legitimate interests.

To the degree that the Commonwealth seeks broader protections for the reintegration and rehabilitation of defendants who have been drawn into the criminal justice system than the individualized impoundment evaluation *Pokaski* prescribes, the Common-wealth is free to establish a set of prohibitions against discrimination on the basis of criminal history. Housing, employment and credit determinations are presently the subject of legislative control to bar forms of discrimination violative of state public policy. The privacy interests at issue in this case, now guarded by the alphabetical index impoundment regime developed under CORI regulation, can similarly be the subject of legislative control to prevent discrimination and mistreatment.

But the Commonwealth may not seek to achieve those ends by automatically burdening, however subtly or indirectly, the constitutional right of access to court records.

–B–

## RESTRICTIONS AS RESTRAINTS

█ The plaintiffs also seek a broad declaration that the CORI statutory regime is an unconstitutional restraint on the speech of those from whom they have sought information about criminal proceedings. For example, § 178 of the CORI scheme makes it a crime for any person "who seeks to communicate criminal offender record information to any agency or person except in accordance with the provisions of" Mass.Gen.L. ch. 6 §§ 168–175. And § 177 imposes civil liability for such communications. Purportedly concerned about the prohibition on dissemination of, for example, sentencing information, District Attorneys in the Commonwealth have declined to respond to inquiries by the plaintiffs concerning such matters.

Whether Massachusetts may punish the dissemination of confidential information, *see, e.g., United States v. Wallington,* 889 F.2d 573, 578–79 (5th Cir.1989), is not in question. The underlying records are not themselves confidential. As defendants observe, "there is no dispute here about whether the files themselves may be closed to the public; they may not be and are not." *Defendant's Memorandum* at 6. Thus, Massachusetts is not truly seeking to enforce a confidentiality regime.

And there is no meaningful sense in which, for example, the district attorneys asked by the *Globe* to discuss material found in files

open to the public—such as a particular defendant's sentence—would be "releasing" or "revealing" information. A sentence is a matter of public record. Thus, for the Commonwealth to argue that "CORI restricts only the *release* of such information," but that if "any member of the public has lawfully obtained any defendant-specific information, district attorneys are free to comment on that information," *id.* at 56, is at best circular.

This is not to say that Massachusetts is barred from placing restraints on communication by those involved in the judicial process. For example, lawyers involved in a criminal case may be barred from making an "extrajudicial statement that a reasonable person would expect to be disseminated by means of public communication and that relates to: (1) The ... prior criminal record (including arrests, indictments, or other charges of crime) of the accused." Supreme Judicial Court Rule 3:07, DR 7–107(B)(1). *But see Gentile v. State Bar of Nevada, supra.* Massachusetts may also be able to fashion reasonable restrictions on the public discussion, by state employees, of public matters consistent with the doctrine of *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), or designate which employees may engage in such communications.

This case, however, is not in the proper posture to address larger issues of restrictions on the discussion of criminal offender record information. Thus, I need not definitively address the difficult issue whether the plaintiff here has standing to challenge a regulation which may make another person unwilling to discuss certain matters.[9] Nor am I required to reach the question whether the CORI regime generally is an improper restraint on speech. And I do not decide which, if any, other rules, orders or statutes may restrict any person's speech regarding information covered by CORI. It suffices, for present, simply to incorporate in the declaratory decree holding the impoundment of

alphabetical indices unconstitutional a further decree that nothing in the CORI statute may be held to impose liability for the communication of information otherwise available at the time of the communication in a judicial record to which the public has access.

The Commonwealth as a management function may determine which of its officers may disclose such information. Other statutes, court rules and judicial orders may independently govern the right of particular persons to disseminate such information in certain circumstances. Moreover, persons may choose for their own reasons not to disseminate the information. But in order for the CORI statute to function in a fashion consistent with the First Amendment, no sanction may be imposed upon any person who communicates criminal offender records information which is otherwise accessible in public records of the courts.

–C–

## CONCLUSION

For the reasons more fully set forth above, the plaintiffs' motion for summary judgment is hereby ALLOWED to the extent reflected in the FINAL DECREES AND ORDERS entered this day and the defendants' motion for summary judgment is hereby DENIED.

### FINAL DECREES AND ORDERS

In accordance with the "Memorandum and Orders" issued herein this day, it is hereby ORDERED, ADJUDGED AND DECREED:

1. That Mass.Gen.Laws ch. 6, § 172 of the Massachusetts Criminal Offender Records Information System ("CORI") is violative of the First Amendment of the Constitution of the United States insofar as it denies the public access to court-maintained alphabetical indices of defendants in closed criminal cases without an individualized judicial determination on an adequate record that a

---

**9.** Given the overbreadth of the CORI sanction provisions, however, there would appear to be no compelling prudential reasons for erecting a standing barrier to plaintiffs' challenge here. *See generally Maryland v. Joseph H. Munson Co.,*

467 U.S. 947, 957, 104 S.Ct. 2839, 2847, 81 L.Ed.2d 786 (1984); *Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 799, 104 S.Ct. 2118, 2126, 80 L.Ed.2d 772 (1984).

particular defendant's name must be sealed or impounded to serve a compelling state interest;

2. That Administrative Directive 1–84, promulgated in response to CORI, is violative of the First Amendment of the Constitution of the United States insofar as it denies the public access to court-maintained alphabetical indices of defendants in closed criminal cases without an individualized judicial determination on an adequate record that a particular defendant's name must be sealed or impounded to serve a compelling state interest; and

3. That CORI is violative of the First Amendment of the Constitution of the United States to the extent that it imposes a sanction for the communication of criminal offender record information contained in a judicial record open to the public at the time of the communication of such information. This declaration of unconstitutionality of sanction under CORI is without prejudice to any valid statute, other than CORI, court order or rule which may provide an alternative basis for sanction upon such dissemination by a particular person.